NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0648
Kim McCoy
v.
The State

On Appeal from the Superior Court of Bartow County
No. SUCR2018002361

Decided: June 16, 2026

ELLINGTON, Justice.

Appellant Kim McCoy challenges her convictions for felony murder and other crimes in connection with the shooting of her ex-husband, James "Sam" McCoy.[1] McCoy's sole claim of error is

---

[1] The crimes occurred on February 21, 2018. A Bartow County grand jury indicted McCoy on October 17, 2018, for felony murder (Count 1); voluntary manslaughter (Count 2); aggravated assault (Count 3); possession of a firearm during the commission of a felony, with said felony being the felony murder indicted in Count 1 (Count 4); possession of a firearm during the commission of a felony, with said felony being the voluntary manslaughter indicted in Count 2 (Count 5); and possession of a firearm during the commission of a felony, with said felony being the aggravated assault indicted in Count 3 (Count 6). At the conclusion of a jury trial that started on October 21, 2019, the jury found McCoy guilty of felony murder (Count 1) and not guilty of the lesser offense of involuntary manslaughter; not guilty of voluntary manslaughter (Count 2); guilty of aggravated assault (Count 3), but not guilty of its lesser included offense, reckless conduct; guilty of two of the counts of possession of a firearm during the commission of a felony (Counts 4 and 6); and not guilty of the third count of possession of a firearm during the commission of a felony (Count 5). On November 19, 2019, the trial court sentenced McCoy

that the trial court erred in denying her pre-trial immunity motion. Because the record supports the trial court's ruling, we affirm.

Prior to trial, McCoy filed a motion for immunity from prosecution pursuant to OCGA § 16-3-24.2, arguing that she responded in a reasonable manner to what she perceived to be a real and imminent threat of her ex-husband committing a sexual or physical assault upon her. The trial court held a hearing on the motion, and McCoy testified to the following.

McCoy and Sam were together for almost 20 years. They were married for ten years, from 2004 to 2014, were then divorced for nine months, and were married again for about two and a half years, from June 2015 until their divorce on January 31, 2018, 21 days before the shooting. They continued to live together after the second divorce, but they had had discussions about Sam's intent to evict McCoy. A week before the shooting, Sam filed a demand for possession saying that McCoy needed to remove herself from the house or an action for eviction would be filed against her on February 19, 2018, but McCoy had never seen that filing prior to the immunity hearing. McCoy believed that she had "lifetime rights" in Sam's house and told him that she would not be leaving because "it was our house," and that, if he wanted her to leave, he

---

to life in prison for felony murder (Count 1) and merged the aggravated assault charge (Count 3) into the felony murder charge. The court then imposed five years in prison for the possession of a firearm during the commission of a felony conviction (Count 4), to be served consecutively to Count 1, and merged the other possession of a firearm during the commission of a felony charge (Count 6) into the first possession of a firearm charge (Count 4).

McCoy timely filed a motion for new trial on November 21, 2019, which she amended through new counsel on May 15, 2025. The trial court denied the amended motion for new trial on August 27, 2025. McCoy filed a timely notice of appeal, and the case was docketed in this Court to the April 2026 term.

2

would need to go through the court system to have her removed.

During their marriages, McCoy's entire "life was home and work," as she would prepare Sam's breakfast, leave for work, return home from work to fix Sam's lunch, and handle the house chores every day. While at work at either a burger restaurant or the local gas station, Sam required that she call to check in with him every hour or two, and he instructed that, when she interacted with male customers, she was to limit physical contact while handing customers their change. In addition to controlling her everyday actions, Sam also isolated McCoy. McCoy was "not allowed to have any friends," but had one person in her life whom she considered a friend, Donna Weaver, the owner of the burger restaurant, whom she met through Sam. Although McCoy had her own vehicle, Sam would not let her visit her family in North Carolina.

In the beginning of their relationship, there was no physical abuse or sexual abuse. But in 2005 or 2006, when Sam started to attend church and McCoy refused to go with him, the physical abuse — including grabbing, pushing and shoving — began. Sam was concerned about his image and the optics of McCoy not attending church with him. The abuse eventually escalated to Sam forcing McCoy to have sex, but McCoy believed it was her "duty" to oblige. In the weeks before the shooting, McCoy at times "refused" to have sex, and Sam would "force himself on [her]" and caused bruising in her inner thighs. But Sam often told McCoy that "a husband can't rape a wife." The physical abuse happened once or twice a week. The last physical abuse occurred about a week before Sam's death, when Sam pushed McCoy, and he made sexual advances in the two to three days before his death. McCoy would retreat from the fights to her bedroom, so Sam removed the locks from her bedroom door and

3

"turned them around" to prevent her from locking him out. McCoy never reported Sam's physical abuse to police or to her friend because she believed those things were private and she was helping protect Sam's good public image.

Two weeks after their second divorce was finalized, on February 14, 2018, McCoy and Sam got into an argument because Sam inquired about purchasing McCoy's vehicle from her, which McCoy refused. She ultimately called 911 that day because Sam had taken her car and gone to church. A week later, McCoy was sitting on her bed when Sam came to the doorway of her bedroom, "yelling and screaming at [her]," about McCoy's refusal to sell Sam her car. As Sam began to enter the room, McCoy told him to leave her alone, and when he refused to listen and continued to approach, McCoy pulled out her gun from underneath her pillow and set it on the bed next to her. Sam asked, "So, you're going to pull a gun on me?" and kept stepping forward. McCoy told Sam that she was not going to argue and that Sam was not going to put his hands on her that day, and Sam replied, "Yes, I will. I will do what I want to when I want to, to whomever I want to. This is my house." McCoy interpreted this to mean that he was "going to be physical," and she "knew he was going to hurt [her]," but she just did not "know how bad it was going to be."

McCoy testified, "[T]he next thing I know he was laying on my feet," as she had shot Sam from a close distance. As Sam was lying there, McCoy first called her brother and then called her friend Weaver before calling 911. McCoy told the 911 operator that she had just shot her ex-husband and that he was trying to have her evicted following their divorce.

McCoy also testified that on the night of the shooting she told an investigator the following. Prior to the shooting, Sam and McCoy had not shared a bed in about a year but had been getting

4

along well. After they divorced, Sam began telling her that she would need to move out, and McCoy disagreed and told him she would only leave if he had her removed. Sam had problems with her refusal to go to church with him, her smoking, and her alcohol consumption, and on the day of the shooting, she had consumed one beer.

At the pretrial immunity hearing, McCoy presented one other witness, Dr. Jamie Dickson, a licensed psychologist who was qualified as an expert in the field of trauma and domestic violence and who testified to the following. Dr. Dickson testified that she interviewed and evaluated McCoy following Sam's death and that she administered three psychological tests to McCoy. McCoy's responses and performance showed that she experienced problematic – but not clinically significant – levels of depression and its associated symptoms and problems with "intrusive ideation of past traumatic experiences" (i.e., reliving those experiences), as well as clinically significant levels of disassociation (i.e., "split[ting] off" one's consciousness from the traumatic event). Dr. Dickson explained that Battered Woman Syndrome ("BWS") is not a mental health disorder on its own but that it does mirror the criteria for Post-Traumatic Stress Disorder ("PTSD"). BWS can result in disassociation, interpersonal difficulties, difficulties in sexual function, difficulties with body image, physical health complaints, changes in thinking and mood – including cognitive confusion, attention difficulties, depression, and feelings of hopelessness and helplessness. BWS also manifests in learned helplessness, where an individual learns her responses are ineffective and gives up fighting back or reduces efforts to change her situation because she has learned that her behaviors would not help change the situation.

Dr. Dickson also testified that there are three levels or

5

stages in the cycle of violence identified with BWS. Level one is the tension building phase, prior to a battery incident, when "the battered woman feels the tension and is perhaps on guard anticipating what might happen." Level two is the actual battering incident itself. And level three is either contrition and/or lack of tension, where the abuser may apologize for his behavior and promise not to do it again. Throughout their interviews, McCoy told Dr. Dickson several things that were indicative of these phases. Regarding the level one tension building phase, McCoy said that she was always thinking about what she could do to make things better to prevent Sam from getting angry or violent, that she had sleeping difficulties and feelings of depression or hypervigilance, but when Sam was in a better mood, she felt at ease. McCoy also reported level two acute battering phase incidents where Sam was pushing, pulling, and grabbing her. And she described signs of the level three contrition phase because she would explain how Sam could be a very loving and good person.

Dr. Dickson further testified that there were other important factors that she took into consideration in her analysis, including that in McCoy's first marriage prior to her marriages to Sam, she experienced physical and sexual abuse by her husband, yet did not leave the relationship until that husband put a gun in her mouth; that she was physically abused by her mother and sexually abused as a child; and that she was raised in a home where she was taught to believe that the woman should be obedient to her husband and that "once you're married … you have to stay married." Dr. Dickson explained that many of those factors are relevant in how learned helplessness may have developed for McCoy. Dr. Dickson also highlighted that the abuse in her relationship with Sam did not start immediately but, rather, grew eventually out of Sam's controlling or isolating

6

behaviors. Based upon these factors and symptoms, Dr. Dickson diagnosed McCoy with PTSD, which she said mirrors the criteria under BWS.

On cross-examination, Dr. Dickson acknowledged that, in addition to PTSD, McCoy was diagnosed with Major Depressive Disorder and Unspecified Alcohol-Related Disorder. She also acknowledged that changes in thinking and moods can be associated with alcohol disorders and that alcohol use can impact a person's sleep and physical health. Further, Dr. Dickson testified that she did not believe McCoy's close friend Weaver was aware of any physical abuse in McCoy's relationship with Sam but that Weaver reported that McCoy was basically "a functioning alcoholic." Further, although McCoy reported the sexual abuse that she faced from her first husband and in her childhood to Dr. Dickson, Dr. Dickson testified that McCoy never reported any prior sexual abuse by Sam to her. Dr. Dickson further testified that McCoy had told her that Sam had been mad for the entire week leading up to the shooting because McCoy refused to sell him her car and told him that he could not drive it to church. She testified that McCoy reporting her car as stolen could be characterized as an effort to fight back, which could conflict with the learned helplessness component. Finally, Dr. Dickson testified that, after McCoy recounted the details of the shooting to Dr. Dickson, McCoy told Dr. Dickson: "That's what I figured I was going to do if he ever came at me again and wouldn't stop. I was going to stop him from getting to me. I didn't mean to kill him." McCoy also made this statement during her own testimony.

After the evidence at the immunity hearing was presented, the trial court opined that the testimony presented seemed more like evidence at trial for the affirmative defense of self-defense as opposed to grounds for a pretrial motion for immunity. The

7

parties acknowledged that immunity is a pretrial decision that needs to be made first even if some of the evidence presented before trial could later be used as an affirmative defense at trial. The court found that the evidence reflected an affirmative defense of justification or of battered person's syndrome that McCoy could present at trial but that it did not carry her burden to "qualify" for a grant of immunity based on the testimony presented at the hearing, the language of OCGA § 16-3-24.2, and the requirement that the defendant carry the burden by a preponderance of the evidence.

The case proceeded to trial the following year. McCoy again testified as she had at the pretrial immunity hearing that she shot Sam because he was physically, sexually, and verbally abusive for their entire marriage; that Sam was enraged on the day of the shooting because McCoy would not sell him her car; and that he had a "look in his eyes" that made her know he was about to beat her and that the beating might end with "sexual connotations."

On appeal, McCoy argues that the trial court erred in denying her pretrial motion for immunity because, on the day of the shooting, she was not engaged in any behaviors that may have negated her claim of justification under OCGA § 16-3-21(b)(1) – (3),[2] but, rather, she was acting in self-defense after Sam entered

---

[2] OCGA § 16-3-21(b) provides:
A person is not justified in using force under the circumstances specified in subsection (a) of this Code section if he:
> (1) Initially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the assailant;
> (2) Is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony; or
> (3) Was the aggressor or was engaged in a combat by

8

her room, started the argument, was "acting aggressively" and not leaving, insinuated that he would hurt her if he wanted because it was his house, and had previously physically and sexually abused her. We conclude that the trial court did not err in denying the motion.

A person generally "is justified in using force which is intended or likely to cause death or great bodily harm ... if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony." OCGA § 16-3-21(a). With some exceptions not relevant here, "[a] person who uses threats or force in accordance with OCGA § 16-3-21 ... shall be immune from criminal prosecution." OCGA § 16-3-24.2. To prevail on a motion for immunity under OCGA § 16-3-24.2, a defendant must "establish [her] justification defense by a preponderance of the evidence." *Sifuentes v. State*, 293 Ga. 441, 444 (2013).

"As the trial court's ruling on a motion for immunity under OCGA § 16-3-24.2 must be based solely on the evidence presented at the pretrial hearing on the motion," our review of McCoy's argument is limited to that evidence as well. *Ellison v. State*, 313 Ga. 107, 108 (2022). "In reviewing the denial of a motion for pretrial immunity, we must view the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them." Id. at 110. "And in the absence of explicit factual and credibility findings by the trial court, we

agreement unless he withdraws from the encounter and effectively communicates to such other person his intent to do so and the other, notwithstanding, continues or threatens to continue the use of unlawful force.

9

presume implicit findings were made supporting the trial court's decision." *Davis v. State*, 306 Ga. 430, 432–33 (2019). See also *State v. Hamilton*, 308 Ga. 116, 129 (2020) ("A trial court is free to consider a defendant's testimony when deciding a motion for immunity from prosecution and to make credibility determinations and factual findings based on all of the evidence before it — findings that this Court will accept so long as they are supported by any evidence.").

In denying McCoy's motion for immunity, the trial court did not make explicit factual or credibility findings during its oral ruling but did state that it weighed the testimony presented by the parties and found that the testimony did not support the grant of the motion. Here, reviewing the evidence from the pretrial immunity hearing in the light most favorable to the trial court's ruling, we determine that the trial court was authorized to find that McCoy did not meet her burden of showing by a preponderance of the evidence that she was justified in using deadly force under OCGA § 16-3-21. The only eyewitness testimony that the defense presented about what transpired between McCoy and Sam when Sam entered the bedroom was McCoy's own testimony. The defense also presented testimony from Dr. Dickson regarding her interviews and assessments of McCoy. But the evidence at the hearing supported conflicting theories of potential explanations of McCoy's conduct. Prior to the shooting, McCoy was aware of Sam's desire to have her move out of their shared house following the second divorce. McCoy testified that she still loved her ex-husband, that she did not want a divorce, and that she did not want to leave their house. And when McCoy called 911 following the shooting, she told the operator that, after their divorce, Sam was trying to have her evicted but that she refused. Further, Dr. Dickson also testified that McCoy insinuated to her that McCoy had previously

considered using deadly force against Sam when McCoy told Dr. Dickson that she did "what [she] figured [she] was going to do if he ever came at [her] again and wouldn't stop."

Here, as the trier of fact at the immunity hearing, the trial court did not have to credit McCoy's testimony about the events leading up to the shooting. And although the trial court did not explicitly state that it was not crediting McCoy's testimony, the court explained that the evidence did not qualify her for immunity from prosecution but, rather, was more in line with an affirmative defense that she could present at trial, and we presume, under the circumstances here, that the court made implicit findings supporting its ruling. See *Davis*, 306 Ga. at 432–33. At the hearing, the defense presented evidence, and the State elicited evidence in its cross-examination of the witnesses, and when viewed in the light most favorable to the trial court's ruling, the evidence supported the trial court's implicit decision not to credit McCoy's testimony and finding that she had not carried her burden. See *Ellison*, 313 Ga. at 110. See also *Hornbuckle v. State*, 300 Ga. 750, 753 (2017) (holding that the trial court was authorized to conclude that defendant's actions were motivated by aggression or anger rather than self-defense where physical evidence, the defendant's 911 statements, and defendant's testimony on cross examination provided conflicting explanations for what happened). See also *Benson v. State*, __ Ga. __ (2026), S26A0425, slip op. at 15-16 (May 19, 2026) (holding that the trial court did not abuse its discretion in finding that critical portions of defendant's testimony were not credible, that defendant acted out of anger rather than fear, and that he had not shown that he was justified by a preponderance of the evidence).

On appeal, McCoy does not allege any legal error in the denial of her immunity motion but, rather, restates what she

11

alleged in her motion for pretrial immunity: that McCoy faced abuse at the hands of her ex-husband and acted in self-defense of what she anticipated he might do. But McCoy's disagreement with the trial court's implicit fact-finding and credibility determination does not persuade us that the trial court erred in its conclusions. Instead, the court was authorized to reject McCoy's self-serving testimony, to implicitly conclude that a reasonable person would not believe deadly force was necessary here, and to find that, under the circumstances presented in this case, McCoy could not establish her justification defense under OCGA § 16-3-21 by a preponderance of the evidence so as to entitle her to immunity under OCGA § 16-3-24.2.

*Judgment affirmed. All the Justices concur.*